170 P.3d 266

**STATE of Arizona, Appellee,**

v.

**Theron Jackson TEAGLE, Appellant.**

No. 1 CA–CR 06–0590.

Court of Appeals of Arizona, Division 1, Department A.

Nov. 1, 2007.

Review Denied March 18, 2008.

Terry Goddard, Attorney General by Randall M. Howe, Chief Counsel Criminal Appeals Section and Jessica L. Quickle, Assistant Attorney General, Phoenix, Attorneys for Appellee.

Emily Danies, Tucson, Attorney for Appellant.

## OPINION

HALL, Judge.

¶ 1 Theron Jackson Teagle was convicted of one count of transportation of marijuana for sale, a class two felony, in violation of Arizona Revised Statutes (A.R.S.) section 13–3405(A)(4) (Supp.2006) and one count of possession of drug paraphernalia, a class six felony, in violation of A.R.S. § 13–3415(A) (2001). He appeals from his convictions, arguing that the trial court erred by denying his motion to suppress evidence and his motion for judgment of acquittal. For the reasons that follow, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶ 2 In reviewing a trial court's decision on a motion to suppress, we view the facts in the light most favorable to upholding the trial court's ruling and consider only the evidence presented at the suppression hearing. *State v. Wyman,* 197 Ariz. 10, 12, ¶¶ 2, 3 P.3d 392, 394 (App.2000).[1]

¶ 3 At approximately 3:00 p.m. on October 18, 2003, Arizona Department of Public Safety Officer Brian Greene stopped the Mercury Grand Marquis defendant was driving on U.S. Route 93 at milepost 189, approximately 11 miles north of Wickenburg, for speeding. When Officer Greene approached the passenger side of the vehicle, he noticed two cellular phones mounted on the dashboard near the steering wheel, an open container of liquor, fast-food wrappers, a box of cookies, and a map on the passenger seat, and luggage and clothing hung up in the backseat. Officer Greene then informed defendant that he had been speeding, asked him for his driver license and registration, and requested that he exit the vehicle.

¶ 4 Defendant produced a temporary, paper driver license from Maryland and a Florida photo-identification card, but did not provide registration documentation. When asked about the Smirnoff alcoholic beverage in his vehicle, defendant claimed that he believed it was "a lemon-lime drink." Officer Greene then conducted field sobriety tests on defendant but determined he was not impaired.

¶ 5 While issuing defendant a warning, Officer Greene asked him several questions regarding his visit to Arizona. In answering the officer's questions, defendant explained that he was on vacation from Florida and driving "to Las Vegas to play pool and maybe gamble." Officer Greene asked defendant whether he was participating in a pool tournament and defendant responded that he was not a professional player, but planned to "find a bar" that had a pool table. Defendant also informed the officer that he had driven from Florida to Arizona in "two to three days" and that he did not have a hotel reservation in Las Vegas. When asked why he had multiple cellular phones, defendant responded that he simply "wanted a new cell phone" and that his new phone had pre-paid minutes while his older cellular phone was under a contract plan.

¶ 6 After issuing defendant a warning for speeding, Officer Greene returned defendant's documentation and informed him that he was free to leave. However, as defendant turned to return to his vehicle, Officer Greene inquired whether he could ask him a

---

1. Defendant did not testify at the hearing. Therefore, the recitation of facts is based on the testimony of the two police officers called by the State.

few more questions and defendant responded in the affirmative. Officer Greene then asked defendant if there was any contraband in the vehicle and defendant stated "oh, no." As a follow-up question, the officer asked defendant "if there was a chance" someone else had placed contraband in the vehicle and defendant answered "none that [I am] aware of." Officer Greene then asked defendant for consent to search the vehicle and defendant stated "yes and no." When asked to explain his response, defendant informed the officer that he "had nothing to hide" but would not consent to the search. Defendant also informed Officer Greene that he did not "want to wait."

¶ 7 At that point, Officer Greene returned to his patrol vehicle to contact the dispatcher and inquire whether a canine unit was available. However, when Officer Greene spoke with the dispatcher, she informed him that another officer needed assistance with an "extreme safety issue" regarding a stolen vehicle a few miles away. Accordingly, Officer Greene told defendant that he was free to leave and then proceeded to drive north toward the location of the officer in need of assistance. Before Officer Greene reached the other officer, however, he was notified that his assistance was no longer necessary and he turned his vehicle around and began traveling south.

¶ 8 As Officer Greene drove southbound on Route 93, he observed defendant's vehicle traveling at a speed of seventy-four miles per hour, again exceeding the speed limit. At 3:36 p.m., the officer initiated another stop of defendant's car at milepost 186. By the time Officer Greene exited his vehicle, defendant was approaching the patrol car. The officer then informed defendant that he was again observed speeding and defendant explained that he had been preoccupied while attempting to set his cruise control and was therefore unaware that he had been speeding. Officer Greene issued defendant another warning and told him he was free to leave. However, Officer Greene then asked defendant whether he would consent to a search of

the car and defendant responded that he would not because he had "nothing to hide."

¶ 9 Once again, Officer Greene contacted the dispatcher to inquire whether a canine unit was available. The dispatcher made some inquiries and, after a wait of what the officer described as "five to ten minutes," the dispatcher informed the officer that no canine unit from any of the neighboring communities was available and that the closest available canine unit was approximately sixty miles away in Prescott Valley and it would therefore take approximately an hour to an hour and one-half for the canine unit to reach Officer Greene's location.

¶ 10 Officer Greene informed defendant that he had requested a canine unit and that it would be up to ninety minutes before it arrived. Defendant responded that the delay was "fine" because he was "retired" and could wait.

¶ 11 At 5:27 p.m., one hour and six minutes after he was called to the scene, Patrol Deputy John Keough of the Yavapai County Sheriff's Office arrived with his canine. Deputy Keough led the canine around defendant's vehicle for an exterior sniff. After approximately ten seconds, the dog alerted at the back of the vehicle. Based on the alert, Deputy Keough informed Officer Greene that he had probable cause to search the car. Officer Greene proceeded to open the vehicle's trunk and discovered 337 pounds of marijuana.

¶ 12 Defendant was placed under arrest and indicted for one count of knowingly transporting marijuana for sale and one count of possession of drug paraphernalia. Defendant pled not guilty to the charges.

¶ 13 Before trial, defendant filed a motion to suppress the evidence seized from the vehicle on the basis that it was obtained in violation of the Fourth Amendment to the United States Constitution and Article 2, Section 8, of the Arizona Constitution.[2] Specifically, defendant argued that his prolonged detention beyond the scope of the traffic stop was unlawful because it was not consensual

---

**2.** Article 2, Section 8, states: "No person shall be disturbed in his private affairs, or his home in-    vaded, without authority of law."

and the officer lacked reasonable suspicion of criminal activity.

¶ 14 Following an evidentiary hearing, the trial court denied defendant's motion to suppress, stating in relevant part:

The questions which may have been outside the scope of reasonable inquiry relative to the purpose of the stop were within the scope of reasonable inquiry given the items observed or noticed by the officer. Specifically the officer observed multiple cell phones mounted on the dash board, luggage on the rear seat, Defendant's lack of vehicle registration documents, a temporary license issued to Defendant by one state (Maryland), and a state identification card issued to Defendant by another state (Florida).

Based upon this Court's review of the factors noted above, and the authorities cited, the Court finds there were sufficient particularized, objective factors, noticed and observed by the citing officer to arouse his reasonable suspicion justifying the detention of Defendant for a period of time to permit an exterior canine sniff. The closest, available canine unit was Deputy [K]enough, who was contacted by dispatch in central Yavapai County at 4:21 p.m. and arrived on scene in western Yavapai County at 5:27 p.m. The time of travel and the consequent period of detention was one hour and six minutes. The detention of the Defendant was not unreasonably prolonged.

¶ 15 The matter proceeded to trial. At the close of the State's presentation of evidence, defendant moved for a directed verdict of acquittal, which the trial court denied. After Defendant presented his witnesses, he renewed his motion for judgment of acquittal, which the trial court also denied.

¶ 16 The jury found defendant guilty as charged. The trial court sentenced defendant to an aggravated term of seven and one-half years imprisonment for transportation of marijuana for sale and to a concurrent six-

month term of probation for possession of drug paraphernalia.

¶ 17 Defendant timely appealed. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 12–120.21(A)(1) (2003), 13–4031 and –4033 (2001).

## DISCUSSION

### I. Denial of Defendant's Motion to Suppress

¶ 18 Defendant argues that the trial court erred by denying his motion to suppress. Specifically, defendant contends that the police officer was not permitted to investigate matters beyond the scope of his initial traffic offense, speeding, and that he was illegally detained.

■ ¶ 19 In reviewing a trial court's decision on a motion to suppress evidence based on an alleged Fourth Amendment violation,[3] we defer to the trial court's factual findings, including findings on credibility and the reasonableness of the inferences drawn by the officer, but we review de novo mixed questions of law and fact and the trial court's ultimate legal conclusions as to whether the totality of the circumstances warranted an investigative detention and whether its duration was reasonable. *State v. O'Meara*, 197 Ariz. 328, 329, ¶ 2, 4 P.3d 383, 384 (App.1999) (*O' Meara I* ); *see also United States v. Arvizu*, 534 U.S. 266, 275, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

■ ¶ 20 The first clause of the Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The protection against unreasonable seizures "extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *Arvizu*, 534 U.S. at 273, 122 S.Ct. 744. Pursuant to *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a

---

**3.** Except in cases involving "unlawful" warrantless home entries, the right of privacy afforded by Article 2, Section 8, has not been expanded beyond that provided by the Fourth Amendment. *See State v. Juarez*, 203 Ariz. 441, 444–45, ¶ 14, 55 P.3d 784, 787–88 (App.2002). Therefore, we rely on Fourth Amendment jurisprudence in determining the propriety of the trial court's suppression order.

police officer may make a limited investigatory stop in the absence of probable cause if the officer has an articulable, reasonable suspicion, based on the totality of the circumstances, that the suspect is involved in criminal activity.

¶ 21 Defendant argues that he was subjected to an unreasonable seizure when, after being issued the second written warning for speeding, he was further detained and subjected to additional questioning and the drug dog sniff. These claims are premised on the principle that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop [and] ... the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

¶ 22 Once an officer conducting a routine traffic stop has confirmed that the driver has produced a valid license and proof of entitlement to operate the vehicle, the driver must be permitted to proceed on his way without further delay or questioning unless: (1) "the encounter between the officer and the driver ceases to be a detention, but becomes consensual, or (2) during the traffic stop the officer gains a reasonable and articulable suspicion that the driver is engaged in illegal activity." *United States v. Mendez*, 118 F.3d 1426, 1429–30 (10th Cir.1997) (internal quotations and citations omitted).

¶ 23 Defendant's initial claim is that Officer Greene violated the Fourth Amendment by investigating matters beyond the scope of his traffic offense. We disagree. After Officer Greene returned defendant's documents to him and handed him his written warning following the first traffic stop, the purpose of the traffic stop had concluded and Officer Greene told defendant he was free to leave. However, contrary to defendant's assertions, Officer Greene "was equally free to ask [defendant] additional ques-

tions unrelated to the traffic stop." *State v. Box*, 205 Ariz. 492, 498, ¶ 21, 73 P.3d 623, 629 (App.2003); *see also Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (permissible for a police officer, after concluding a traffic stop, to ask the driver whether he carried drugs or money and for permission to search the car); *State v. Flores*, 195 Ariz. 199, 986 P.2d 232 (App.1999) (same). Therefore, defendant was not "seized" under the Fourth Amendment when he agreed to answer additional questions. *See Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) ("[M]ere police questioning does not constitute a seizure.").

¶ 24 Following Officer Greene's issuance of the second warning to defendant, he again asked defendant if he would consent to a search of his vehicle. However, any additional delay attributable to asking for defendant's consent was de minimus and did not unreasonably extend the traffic stop. *See United States v. Olivera–Mendez*, 484 F.3d 505, 510–11 (8th Cir.2007) (citing cases holding that "an officer does not violate the Fourth Amendment by asking a few questions about matters unrelated to the traffic violation, even if this conversation briefly extends the length of the detention").

¶ 25 However, the continued detention of defendant after he declined Officer Greene's request to search constituted an additional seizure within the meaning of the Fourth Amendment.[4] Therefore, we must determine whether Officer Greene was justified in temporarily detaining defendant for further investigation to confirm or dispel his suspicion that defendant was transporting illegal drugs. "By definition, reasonable suspicion is something short of probable cause." *State v. O'Meara*, 198 Ariz. 294, 296, ¶ 10, 9 P.3d 325, 327 (2000) (*O'Meara II* ). Although "reasonable suspicion" must be more than an inchoate "hunch," the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory detention. *See United States v. Sokolow*,

---

4. Although Officer Greene testified that defendant was not being detained and could have left had he wanted, the evidence does not reasonably support a finding that defendant was free to go. Therefore, the trial court appropriately analyzed the situation as a continued detention requiring reasonable suspicion.

490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (noting that reasonable suspicion represents a "minimal level of objective justification" that is "considerably less than proof of wrongdoing by a preponderance of the evidence"). In determining whether a police officer had a reasonable suspicion, a court "cannot parse out each individual factor, categorize it as potentially innocent, and reject it. Instead, [a court] must look at all of the factors, (all of which would have a potentially innocent explanation, or else there would be probable cause), and examine them collectively." *O'Meara II,* 198 Ariz. at 296, ¶ 10, 9 P.3d at 327. However, circumstances that "describe a very large category of presumably innocent travelers" are insufficient to establish reasonable suspicion because travelers would then be subject to "virtually random seizures." *Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). Thus, "[t]he articulated factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied." *United States v. Foreman,* 369 F.3d 776, 781 (4th Cir.2004).

¶ 26 In reviewing the totality of the circumstances, we accord deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious actions. *See Arvizu,* 534 U.S. at 273–74, 122 S.Ct. 744 (explaining the totality of the circumstances analysis for determining whether the detaining officer had a "particularized and objective basis for suspecting illegal wrongdoing allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person") (internal quotations and citation omitted); *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (noting the "totality of the circumstances test" permits law enforcement officers to draw "common sense conclusions about human behav-

ior") (quoting *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)); *O'Meara I,* 197 Ariz. at 331, ¶ 8, 4 P.3d at 386 (noting the court, in assessing the existence of reasonable suspicion, should give due weight "not to [the officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience") (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868).

¶ 27 We undertake a two-step inquiry to determine the constitutionality of an investigative detention. *Terry,* 392 U.S. at 19–20, 88 S.Ct. 1868. First, we must decide whether the police officer's action was justified at its inception. *Id.* at 20, 88 S.Ct. 1868. Second, we consider whether the action was reasonably related in scope to the circumstances that justified the interference in the first place. *Id.*

¶ 28 At the time of this incident, Officer Greene had approximately four years experience in law enforcement and had attended numerous schools in addition to basic academy training, including three drug interdiction schools. Based on his specialized training and experience, the officer testified that the following indicators present at this traffic stop were, in combination with one another, consistent with the trafficking of illegal drugs or other criminal activity: (1) the nature of defendant's travel plans, namely, that he traveled from Florida to Phoenix in only two to three days, unusually fast for someone on vacation, and that his stated purpose for driving from Florida to Las Vegas was to play pool in a bar, yet he had no specific plans or hotel reservations; (2) the mounted cellular phones, indicating both were in use; (3) the fast-food wrappers and containers of food; (4) the luggage and clothing hung in the backseat rather than the trunk; (5) defendant's response during the first stop that he was not "aware" of anyone placing contraband in his vehicle;[5] (6) defendant's decision

---

**5.** Officer Greene testified that he viewed defendant's response that he was "not aware of" any contraband in his vehicle as a significant "red flag" because:

> In my experience, I've arrested numerous people with regards to a warrant or drugs, wheth-

er it is personal use or otherwise, and I have not had a situation when somebody has stated "not that I'm aware of" and there was not either a warrant or contraband with him. People that have warrants know that they have warrants and people that [ ] have drugs in the

to exit his vehicle and approach the patrol car during the second stop; and (7) the stop occurred in a known drug corridor.

¶ 29 Viewed separately, each of the observed factors is entirely consistent with innocent travel.[6] But our task is not to subject each of these factors to detailed analysis and determine whether any one of them, standing alone, is indicative of criminal or innocent conduct. *See Sokolow,* 490 U.S. at 9, 109 S.Ct. 1581 ("Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion."); *O'Meara II,* 198 Ariz. at 296, ¶ 9, 9 P.3d at 327 ("[W]hen addressed individually, almost any factor short of a 10 pound bale of marijuana on the front seat of the vehicle may have an innocent explanation.") (quoting *State v. Magner,* 191 Ariz. 392, 401, ¶ 39, 956 P.2d 519, 528 (App.1998) (Voss, J., dissenting)). Instead, the proper inquiry is whether, taken together, "they sufficed to form a particularized and objective basis" for Officer Greene to seize defendant on suspicion of transporting illegal drugs. *Arvizu,* 534 U.S. at 277, 122 S.Ct. 744. Viewing the mosaic of facts and circumstances "from the standpoint of an objectively reasonable police officer," *Ornelas,* 517 U.S. at 696, 116 S.Ct. 1657, and giving due deference to Officer Greene's training and experience, we conclude that the totality of the circumstances established a reasonable suspicion that defendant was transporting illegal drugs and justified his further detention.

¶ 30 Having determined that the investigative detention was justified at its inception, we now consider whether the action was reasonably related in scope to the circumstances that justified the interference in the first place. The only issue raised by defendant regarding the scope of the detention is its length. One hour and forty minutes elapsed from the time Officer Greene radioed the DPS dispatcher requesting a drug-detection dog until it arrived on the scene. Such a substantial amount of time for an investigative detention merits scrutiny; however, "[t]he permitted duration of a *Terry*-stop cannot be measured by the clock alone." *Carter v. State,* 143 Md.App. 670, 795 A.2d 790, 803 (2002).

¶ 31 Instead, as explained in *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), whether the length of a particular detention is reasonable under the Fourth Amendment is measured by balancing the degree of intrusion on the individual's privacy against the societal need that justifies the intrusion:

> [O]ur cases impose no rigid time limitation on *Terry* stops. While it is clear that the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion, we have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes. Much as a "bright line" rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.

*Id.* at 685, 105 S.Ct. 1568 (internal quotations and citations omitted). *See United States v. Place,* 462 U.S. 696, 709–10, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (declining to "adopt any outside time limitation for a permissible *Terry* stop" and instead focusing the inquiry on whether the "police diligently pursue[d] their investigation").

¶ 32 In *Place,* DEA agents at LaGuardia Airport in New York, acting on information

vehicle know that they do and "none that I'm aware of" is a typical easy way to avoid a lie.

6. *See, e.g., United States v. Bradford,* 423 F.3d 1149, 1157 (10th Cir.2005) (noting that "wrappers from fast food establishments strewn about a car may indicate slovenliness or the need to travel while eating, but do not by themselves indicate a driver smuggling contraband"); *United States v. Townsend,* 305 F.3d 537, 542–43 (6th Cir.2002) (finding the presence of multiple cell phones to be a weak indicator and, if "not accompanied ... by more substantially suspicious factors," insufficient to create reasonable suspicion); *State v. Retherford,* 93 Ohio App.3d 586, 639 N.E.2d 498, 509 (1994) ("[Defendant] was travelling alone, so we think it would be not unnatural to place what little luggage she had into the back seat.").

received from law enforcement officers at Miami International Airport, seized the defendant's luggage after his arrival from Miami and detained it for 90 minutes while they awaited the arrival of a narcotics detection dog. *Id.* at 698–99, 103 S.Ct. 2637. The Court held that "[t]he length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause." *Id.* at 709, 103 S.Ct. 2637. But as the Court later explained in *Sharpe* when it rejected a *per se* time limitation for a *Terry*-stop, "the rationale underlying that conclusion [in *Place* ] was premised on the fact that the police knew of respondent's arrival time for several hours beforehand, and the Court assumed that the police could have arranged for a trained narcotics dog in advance and thus avoided the necessity of holding respondent's luggage for 90 minutes." 470 U.S. at 684–85, 105 S.Ct. 1568. Although acknowledging that "if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop," *id.* at 685, 105 S.Ct. 1568, the Court stated:

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.

*Id.* at 686, 105 S.Ct. 1568 (internal quotations and citations omitted).

¶ 33 In assessing whether the duration of defendant's detention was reasonable under the circumstances of this case, we begin by considering the law enforcement purpose served by the detention. Police may reasonably detain an individual suspected of committing a serious crime for a longer period of time than an individual suspected of committing a less serious offense. *See United States v. Oates*, 560 F.2d 45, 59 (2nd Cir.1977) ("[W]hen the police officer knows or suspects that an offense with serious societal consequences is being committed and there is some reasonable possibility that the person he detains is involved, a more substantial detention is justified."). Because the societal interest in interdicting the transportation (and presumed distribution) of illegal drugs is substantial, *see Place*, 462 U.S. at 704–05, 103 S.Ct. 2637 ("prevent[ing] the flow of narcotics into distribution channels" by allowing investigative stops of suspected drug couriers is a "strong governmental interest"), a person who is reasonably suspected of transporting drugs may be justifiably detained for a longer time than a person detained for a less serious offense.

¶ 34 Second, unlike the DEA agents in *Place*, Officer Greene was reacting to a "swiftly developing situation" and had no reason to arrange for the presence of drug-detection dogs before he encountered defendant. Therefore, even though an investigative detention cannot be prolonged indefinitely without violating the Fourth Amendment, a significant factor in the permissible length of defendant's seizure is how long it would reasonably take to find a drug-detection dog and transport it to defendant's location. *See Carter*, 795 A.2d at 803 ("[T]he measure of reasonableness is simply the diligence of the police in calling for and procuring the arrival of the canine at the scene.").

¶ 35 The trial court's finding that defendant's detention was "not unreasonably prolonged" is supported by the record. The nearest available canine unit, which was approximately sixty miles away in Prescott Valley, arrived 68 minutes after being called to the scene. The record does not contain a detailed explanation of the reason for the 32–minute delay from when Officer Greene initially contacted the dispatcher to request a drug-detection dog be sent to the scene to when the unit was sent. However, it appears that the delay was due to efforts to check on the availability of closer canine units and not to a lack of diligence. Although the total delay of one hour and forty minutes is an unusually long period of time to detain a person while awaiting the arrival of a drug-detection dog, we cannot say that a delay of such length is necessarily unreasonable.

"When police need the assistance of a drug dog in roadside *Terry* stops, it will in general take time to obtain one; local government police forces and the state highway patrol cannot be expected to have drug dogs immediately available to all officers in the field at all times." *United States v. Bloomfield,* 40 F.3d 910, 917 (8th Cir.1994).

¶ 36 We next consider the extent to which the detention interfered with defendant's Fourth Amendment liberty interest. The lengthy period for which defendant was detained prior to his arrest is somewhat ameliorated by defendant's statement, when informed that the nearest drug detection dog was more than an hour away, that the delay was "fine" because he was "retired" and could wait. *See United States v. Tavolacci,* 895 F.2d 1423, 1428 (D.C.Cir.1990) (finding duration of detention reasonable because, in part, the "detention did not interfere with defendant's travel plans"). Furthermore, although he was not free to leave the scene, defendant was not physically restrained and was permitted to move around. When the canine unit arrived at the scene, defendant was sitting in the front seat of his car.[7]

¶ 37 In balancing the justification for and circumstances of defendant's detention against the degree to which his liberty was intruded upon, we conclude that Officer Greene did not act unreasonably by detaining defendant for one hour and forty minutes pending the arrival of a drug-detection dog. *See United States v. Maltais,* 403 F.3d 550, 557–58 (8th Cir.2005), *cert denied,* 546 U.S. 1177, 126 S.Ct. 1345, 164 L.Ed.2d 59 (finding detention of defendant for two hours and fifty-five minutes while awaiting arrival of drug dog in remote area not unreasonable); *United States v. White,* 42 F.3d 457, 460 (8th Cir.1994) (determining that it was reasonable for an officer to detain a truck for eighty minutes while awaiting the arrival of a drug dog when the officer "acted diligently to obtain the dog, and the delay was caused only by the remote location of the closest available

dog"). Therefore, the trial court did not err by denying defendant's motion to suppress.

## II. Denial of Defendant's Motion for Judgment of Acquittal

¶ 38 Defendant contends the trial court erred by denying his Rule 20 motion for judgment of acquittal on both charges. Specifically, defendant claims there is no evidence that he had the requisite knowledge that he was transporting drugs in his car.

¶ 39 In reviewing the denial of a motion for judgment of acquittal, we view the evidence in the light most favorable to sustaining the verdict and affirm unless no substantial evidence supports the conviction. *State v. Pena,* 209 Ariz. 503, 505, ¶ 7, 104 P.3d 873, 875 (App.2005).

¶ 40 Substantial evidence is evidence that "reasonable persons could accept as sufficient to support a guilty verdict beyond a reasonable doubt." *State v. Hughes,* 189 Ariz. 62, 73, 938 P.2d 457, 468 (1997). The substantial evidence required to support a conviction may be direct or circumstantial. *Pena,* 209 Ariz. at 505, ¶ 7, 104 P.3d at 875.

¶ 41 "The sufficiency of the evidence must be tested against the statutorily required elements of the offense." *Id.* at 505, ¶ 8, 104 P.3d at 875. A person violates § 13–3405(A)(4) by knowingly transporting marijuana for sale. To satisfy these statutory elements, the State must prove, among other things, "either actual physical possession or constructive possession with actual knowledge of the presence of the narcotic substance." *Maricopa County Juv. Action No. J–72773S,* 22 Ariz.App. 346, 348, 527 P.2d 305, 307 (1974). Constructive possession can be established by showing that the accused exercised dominion and control over the drug itself, or the location in which the substance was found. *See State v. Curtis,* 114 Ariz. 527, 528, 562 P.2d 407, 408 (App. 1977). However, a person's "mere presence at a location where narcotics are found is insufficient to establish knowledgeable pos-

---

7. The canine investigation of the exterior of defendant's vehicle was not a "search" under the Fourth Amendment. *Illinois v. Caballes,* 543 U.S. 405, 408–09, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005); *see also State v. Weinstein,* 190 Ariz.

306, 310, 947 P.2d 880, 884 (App.1997). Once the dog alerted outside the vehicle, the police officers had probable cause to search the entire car. *Weinstein,* 190 Ariz. at 310–11, 947 P.2d at 884–85.

session or dominion and control over narcotics." *State v. Jung*, 19 Ariz.App. 257, 261, 506 P.2d 648, 652 (1973).

¶ 42 It is undisputed that defendant was the individual in possession of the vehicle at the time the drugs were found in the trunk. In addition, at trial, Officer Greene testified regarding all of his observations that created reasonable suspicion that defendant was participating in criminal activity. Moreover, Officer Greene also testified that, during his search of the vehicle subsequent to the canine alert, he discovered a can of air freshener under the driver's seat and several toilet bowl sanitizers in the compartment of the vehicle as well as the trunk. Officer Greene explained that these air freshening devices are often used by drug traffickers to mask the odor of marijuana.

¶ 43 Following the trial court's denial of his Rule 20 motion at the conclusion of the State's case-in-chief, defendant testified. In so doing, he took the risk of supplying any missing evidence in the State's case. *See State v. Nunez*, 167 Ariz. 272, 279, 806 P.2d 861, 868 (1991) ("A defendant who goes forward and presents a case waives any error if his case supplies the evidence missing in the state's case."). Defendant's testimony was inconsistent in some respects with the version of events he related to Officer Greene at the time of his arrest. Defendant testified that he had taken his vehicle to a "repair shop" in Tucson on October 17, 2003, the day before his arrest, implying that someone else may have placed the drugs in the trunk of his car. Defendant also testified that his trip from Florida was not a "vacation," as he had informed Officer Greene. Instead, defendant claimed that he was being paid to transport people from state to state. Defendant also testified that he did not know there were drugs in the car and suggested his lack of knowledge was evidenced by his statement to Officer Greene to "bring on your dogs."

¶ 44 We conclude that the record contains sufficient evidence from which reasonable persons could find that defendant knowingly transported marijuana. A jury may properly infer that a driver and sole occupant of a vehicle containing a large amount of drugs was aware that the drugs were in the vehicle.

*Beijer v. Adams ex rel. County of Coconino*, 196 Ariz. 79, 84, ¶ 25, 993 P.2d 1043, 1048 (App.1999) ("[T]he presence of the drugs in the trunk of the car the Defendant was driving was sufficient, in and of itself, to support a conclusion beyond a reasonable doubt that he was knowingly transporting the drugs."); *United States v. Barbosa*, 906 F.2d 1366, 1368 (9th Cir.1990) ("[M]ere possession of a substantial quantity of narcotics is sufficient to support an inference that a defendant knowingly possessed the narcotics."); *United States v. Murrieta–Bejarano*, 552 F.2d 1323, 1324 (9th Cir.1977) (jury could infer driver and sole occupant of truck at border crossing knew of 138 pounds of marijuana concealed in truck), *overruled on other grounds by U.S. v. Heredia*, 483 F.3d 913 (9th Cir.2007).

¶ 45 Moreover, as the sole judges of defendant's credibility, the jurors were also entitled to consider that defendant provided them a different explanation for being in Arizona than he gave Officer Greene. *See United States v. Hursh*, 217 F.3d 761, 768 (9th Cir.2000) (defendant's knowing possession of drugs supported by his changing explanation for his trip to Mexico); *see also State v. Young*, 192 Ariz. 303, 312, 965 P.2d 37, 46 (App.1998) (jury's verdict that defendant knowingly possessed a prohibited weapon supported by defendant's inconsistent testimony regarding how he came into possession of it).

¶ 46 Because substantial evidence supports the jury's guilty verdicts, the court properly denied defendant's motion for judgment of acquittal.

## CONCLUSION

¶ 47 For the foregoing reasons, we affirm defendant's convictions and sentences.

CONCURRING: ANN A. SCOTT TIMMER, Presiding Judge.

NORRIS, Judge, dissenting.

¶ 48 The majority holds Officer Greene had reasonable and "objective justification"

to transform his traffic stop [8] of Defendant into a drug investigation. *See supra* ¶ 25. The majority sets out the applicable legal principle—whether the totality of the circumstances justified Defendant's continued detention. And, the majority correctly recognizes that the totality of the factors articulated by Officer Greene to justify his detention of Defendant " 'must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied.' " *Id.* (quoting *United States v. Foreman,* 369 F.3d 776, 781 (4th Cir.2004)). *See also State v. Gonzalez–Gutierrez,* 187 Ariz. 116, 120, 927 P.2d 776, 780 (1996) (reasonable suspicion "must be particularized such that it does more than simply describe large numbers of others who are also driving on the highways in that vicinity and at that time.").

¶ 49 "The concept of reasonable suspicion . . . is not 'readily, or even usefully, reduced to a neat set of legal rules.' " *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983)). On review, which is to be de novo, our obligation is to determine independently whether the detaining officer had a "particularized and objective basis for suspecting the person stopped of criminal activity," giving "due weight to inferences drawn from" the historical facts of the stop by the trial courts and law enforcement personnel. *Ornelas v. United States,* 517 U.S. 690, 696, 699, 116 S.Ct. 1657, 1661, 1663, 134 L.Ed.2d 911 (1996) (internal citations omitted). In making this evaluation, we do "not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common—sense conclusions about human behavior; jurors as fact-finders are permitted to do the same—and so are law enforcement officers." *Sokolow,* 490 U.S. at 8, 109 S.Ct. at 1585–86 (quoting *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)).

¶ 50 The problem presented in this case is that most of the factors Officer Greene said triggered his suspicion did not arise out of "common-sense conclusions about human behavior," or what the United States Supreme Court has also described as "commonsense, nontechnical conceptions that deal with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas,* 517 U.S. at 695, 116 S.Ct. at 1661 (internal quotations and citations omitted). Instead, the circumstances Officer Greene found out of the norm or odd were grounded on his own peculiar view of normal versus abnormal behavior. The proof is in Officer Greene's testimony. The majority's summary of his testimony, however, fails to capture the chasm between it and "common-sense conclusions about human behavior."

¶ 51 Officer Greene testified the two cell phones mounted on the dash board, fast food wrappers, a box of cookies, and a suitcase and clothes hanging in the back seat were "indicators . . . out of the norm." He concluded these were out of the norm indicators because cell phones are expensive, a person only needs one, people traveling "almost always" put their luggage in the trunk and do not eat fast food:

> For starters, a single occupant would only have one cell phone. This subject had two and both were mounted, which led me to believe that both are used. Cell phones are not cheap. It is out of ordinary. With luggage in the back seat, people that go on any type of trip almost always put their luggage in the trunk of the vehicle. This was not the case. This was in the back seat.

> Further, numerous fast food wrappers that were in the front of the vehicle. He advised me he was on vacation. Most people don't stop at fast food places. There were cookies and that sort of thing sitting in the front passenger seat.

¶ 52 Officer Greene also found Defendant's reason for going to Las Vegas "odd." He reasoned a person who lives on the East Coast (Defendant had a home in Maryland) should want to go to Atlantic City, not Las

---

**8.** Officer Greene used radar to "clock" Defendant going three miles over the speed limit.

Vegas, to gamble and, further, should make plans:

A. I thought it was odd.

Q. Why?

A. Because he was traveling from Florida going to Las Vegas and made no reservations.

Q. Anything else beyond that?

A. He also stated he was going to play pool in Las Vegas. I asked him where he was going to play pool. He didn't have a location. I asked if he was a professional and he stated no. I asked him if he was in a tournament. He stated no on that as well. He had no real plans. He was going to find a bar or location that had a pool table and play pool.

And:

Q. All right. Anything else that you remembered prior to reviewing your report?

A. May I review my report?

Q. Sure.

A. Yes. Mr. Teagle advised me that he had a home in Maryland. With that in mind, I asked him why he didn't go to Atlantic City, which would be the equivalent to Las Vegas on the East Coast, and he didn't give a good response. In reviewing my report here, he stated that he was retired and he was on vacation.

¶ 53 Officer Greene found it suspicious that a retired person on vacation with Las Vegas as his destination would drive the route straight through instead of stopping. He thought that retired people who travel should stop along the way.

A. I believe Mr. Teagle advised me that he was on vacation from Florida going to Las Vegas. It took him two to three days for that and he traveled on Interstate 10 the entire trip from Florida to Tucson.

Q. Was there anything unusual about that?

A. Two to three days is about the maximum amount of time it will take to go from Florida to Tucson without stopping anywhere. It is not much of a vacation to jump on the interstate and travel the entire distance without stopping anywhere.

¶ 54 Finally, Officer Greene found it unusual that Defendant could not provide absolute assurances that no one had tampered with his car. Officer Greene was evidently of the view that a person driving the interstate must maintain 24/7 surveillance of his car. This is exactly what Officer Greene had to say:

A. I remember explaining that U.S. 93 is the major thoroughfare from Florida to Las Vegas. With that in mind, there is a high probability that there is contraband traveling up and down the road. I asked him if he had any guns, knives, weapons of mass destruction, drugs, which include marijuana, cocaine, heroin, methamphetamine or large sums of cash and he stated oh, no.

Q. Okay. Did you make any observation of Mr. Teagle as you were asking him that question?

A. Nothing comes to mind right off.

Q. Anything unusual about his response?

A. After asking him that, he stated oh, no to that question. No.

Q. Okay. Any conversation that followed that?

A. Yes. I asked him if there was a chance that anybody put any items in his vehicle and he stated none that he was aware of. For me, that is a red flag.

¶ 55 In my view, these circumstances did not give rise to reasonable suspicion, even giving due weight to Officer Greene's experience and training. I recognize that a series of events, innocent when examined individually, may, when viewed together, give rise to reasonable suspicion. That is why we are obligated to consider the totality of the circumstances. But, in considering the totality of the circumstances, we must keep in mind the purpose this approach serves—to provide a screening mechanism so the entire traveling public is not subjected to random and unreasonable seizures. Simply, considerations that "reasonable and prudent men" would dismiss as unreliable or without any sliver of suspicious significance deserve no weight when it comes to determining whether there was reasonable suspicion. *Cf. Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (conduct that

"describe[s] a very large category of presumably innocent travelers" is insufficient to constitute reasonable suspicion). Or put another way, "it is not enough that law enforcement officials can articulate reasons why they stopped someone if those reasons are not probative of behavior in which few innocent people would engage—the factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied." *Karnes v. Skrutski*, 62 F.3d 485, 493 (3rd Cir.1995) *abrogated in part on unrelated issue, Curley v. Klem*, 499 F.3d 199 (3rd Cir.2007).

¶ 56 Here, the foregoing circumstances— even when viewed in the aggregate—did not provide Officer Greene with a reasonable basis for distinguishing Defendant from the vast majority of innocent drivers. Indeed, in this conglomeration of circumstances, only one—the presence of two cell phones—seems at all slightly unusual. But, Defendant's explanation to Officer Greene regarding the cell phones, "he stated he just wanted a new cellular phone," reflects conspicuous consumption, not criminal conduct.

¶ 57 After stripping away the foregoing circumstances relied on by Officer Greene, only two other circumstances are left: Defendant's decision to exit his vehicle and approach Officer Greene's patrol car during the second stop, and Officer Greene's opinion that "there is a high probability that there is contraband traveling up and down the road." These factors, in my view, are simply too weak to support a determination that reasonable suspicion existed to detain Defendant. Indeed, given the relatively few major highways in Arizona leading to Las Vegas, all of them could be considered probable drug corridors.

¶ 58 I therefore dissent from the majority's conclusion that the totality of the circumstances established a reasonable suspicion that Defendant was transporting illegal drugs and justified his detention by Officer Greene. The superior court should have granted Defendant's motion to suppress and, accordingly, I would remand this matter to the superior court for further proceedings

consistent with suppression of the evidence seized from Defendant's car.