NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

MICKI LYNN CASTRO, *Appellant.*

No. 1 CA-CR 17-0731
FILED 5-2-2019

Appeal from the Superior Court in Mohave County
No. S8015CR201501499
The Honorable Richard Weiss, Judge (Retired)

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Jana Zinman
*Counsel for Appellee*

Mohave County Legal Advocate, Kingman
By Jill L. Evans
*Counsel for Appellant*

## MEMORANDUM DECISION

Judge Jennifer B. Campbell delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Judge Randall M. Howe joined.

**C A M P B E L L**, Judge:

¶1          Micki Lynn Castro appeals her convictions and sentences for possession of dangerous drugs for sale (methamphetamine) and possession of drug paraphernalia (methamphetamine).  She argues the superior court erred by denying her motion to suppress because the arresting police officer lacked the reasonable suspicion necessary to extend the traffic stop and detain her.  For the following reasons, we affirm.

### BACKGROUND[1]

¶2          On an afternoon in December 2015, Castro left a doctor's office where she was undergoing physical therapy following ankle replacement surgery.  Castro got into the driver's seat of her SUV along with a friend in the passenger's seat and her minor daughter in the backseat.  Shortly after they left the doctor's office, she was pulled over by Detective Cortez. He had observed Castro abruptly change lanes without using her turn signal and cut off another car, and he initiated a traffic stop.

¶3          Detective Cortez approached the driver's-side window and asked Castro for her driver's license, registration, and insurance. Castro asked him why she had been pulled over. He explained she had cut off another car and failed to use her turn signal. Castro "kind of smiled" and said "[you] saw that," which Detective Cortez took to mean "she [knew] she did it, and . . . was caught." Detective Cortez, as an officer working in drug interdiction, was aware of Castro's identity, "had been looking into her because of maybe possible drug sales and activity," and "was trying to look into her behavior." When Castro handed him her license, he waited to take it and noticed that her hand was shaking a little. Detective Cortez also noticed that the friend sitting in the passenger seat was staring straight

---

[1] "When reviewing a ruling on a motion to suppress, we consider only the evidence presented at the suppression hearing and view that evidence in the light most favorable to upholding the court's ruling." *State v. Caraveo*, 222 Ariz. 228, 229 n. 1 (App. 2009).

ahead and "figured she was avoiding [him] for a reason." He also observed that Castro made sure not to move a black sweater in the center console when searching for her paperwork and that she was sweating despite it being around 50 degrees outside. When he asked her why she was sweating, she replied that she had just come from physical therapy for her ankle.

¶4        At that point, another officer arrived, and Detective Cortez asked Castro to exit the SUV. Detective Cortez noticed that Castro again made sure the sweater stayed in place over the center console as she exited. Detective Cortez told Castro that she was not going to get a ticket and he was going to fill out a warning; nevertheless, she continued to appear nervous and her behavior did not change. When he remarked on this, she gave "fake" laughs and smiles that he did not think were genuine. Castro also began yawning repeatedly. When Detective Cortez confronted her with the information that her name had come up as a drug dealer, "[s]he kind of just gave a fake smile" and "raised her eyebrows," but "did not . . . seem surprised." Castro responded that she did not understand what he was saying.

¶5        Detective Cortez then told Castro that during a previous drug investigation some months before, he located a travel trailer being used as a meth lab. That trailer was registered to Castro's daughter, and consequently, Detective Cortez made contact with her husband during the investigation. Castro said she knew nothing about it but again "did not seem surprised" and laughed. Detective Cortez noticed that by then, Castro was cold, her lips were dry, she continuously licked her lips, and she still seemed nervous but was putting on a casual laughing demeanor.

¶6        Detective Cortez told Castro that he knew she had previously been arrested for trafficking methamphetamine and conspiracy and that her name was associated with drug dealing. Castro responded that it was a long time ago and she had completed her probation. Detective Cortez asked her if there was anything illegal in her car. Castro gave no response but looked toward the car. In an attempt to "guilt trip" her into an admission, Detective Cortez said that he hoped there was nothing illegal in the car because her child was in the backseat. Castro responded that there was "nothing in the car basically" and gave another fake laugh. He asked for consent to search the car, and she declined because the "last time she gave consent she got screwed over." Detective Cortez asked her if that meant that last time "probably something was found," to which she "pretty much agreed." He again asked her for consent to search, and Castro refused.

¶7         Detective Cortez concluded—based on what he had heard and observed during the traffic stop—that Castro's taking such care not to move the black sweater on the center console, her yawning and dry lips, her "being hot and then cold," and her overall demeanor were all indicators of criminal activity. He told Castro she was not free to leave and informed her that a canine was en route. When Officer Hammontree arrived with his dog approximately 20 minutes later, the dog sniffed inside the car and alerted. Another officer searched the car and discovered methamphetamine.

¶8         Castro was indicted for one count of possession of dangerous drugs for sale (methamphetamine) and one count of possession of drug paraphernalia (methamphetamine). Before trial, Castro moved to suppress the evidence seized from her car as a result of her roadside detention. The superior court held an evidentiary hearing, taking testimony from Detective Cortez, Officer Hammontree, and the friend who had been sitting in the passenger seat. The court denied Castro's motion to suppress, noting that it was "a close call" but finding that the arresting officer had articulable reasonable suspicion to extend the detention beyond the original traffic stop. After a two-day trial, the jury found Castro guilty of both charges and she was sentenced to a total of six years in prison.

## DISCUSSION

¶9         We review for an abuse of discretion the superior court's denial of a motion to suppress evidence. *State v. Cheatham*, 240 Ariz. 1, 2, ¶ 6 (2016). "[W]e defer to the . . . court's factual findings, including findings on credibility and the reasonableness of the inferences drawn by the officer, but we review de novo mixed questions of law and fact and the . . . court's ultimate legal conclusions as to whether the totality of the circumstances warranted an investigative detention and whether its duration was reasonable." *State v. Teagle*, 217 Ariz. 17, 22, ¶ 19 (App. 2007).

¶10        "The Fourth Amendment prohibits unreasonable searches and seizures by the [g]overnment, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citations omitted). An officer may conduct an investigatory stop of a vehicle when he has a reasonable and articulable suspicion that a traffic violation has occurred, based on the totality of the circumstances. *State v. Sweeney*, 224 Ariz. 107, 112, ¶ 16 (App. 2010). "After an officer has effectuated the purpose of the stop, he must allow a driver to continue on his way unless (1) the encounter between the driver and the officer becomes consensual, or (2) during the

encounter, the officer develops a reasonable and articulable suspicion that criminal activity is afoot." *Id.* at 112, ¶ 17.

**¶11**      Reasonable suspicion must be more than an "inchoate hunch," but "the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory detention." *Teagle*, 217 Ariz. at 23, ¶ 25 (citations omitted). We assess whether an officer had reasonable suspicion "based on the totality of the circumstances, considering such objective factors as the suspect's conduct and appearance, location, and surrounding circumstances, . . . and taking into account the officer's relevant experience, training, and knowledge." *State v. Fornof*, 218 Ariz. 74, 76, ¶ 6 (App. 2008). Further, we "accord deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious actions." *Teagle*, 217 Ariz. at 24, ¶ 26. We will not "parse out each individual factor, categorize it as potentially innocent, and reject it"; instead, we "must look at all of the factors . . . and examine them collectively." *Id.* at 24, ¶ 25.

**¶12**      Here, Detective Cortez had articulable reasonable suspicion to extend the traffic stop and call for a canine unit. During the suppression hearing, Detective Cortez testified that he had been a police officer for almost 14 years, had participated in multiple training courses on highway drug interdiction and drug trends, had been a member of the gang task force for the past three years, and had conducted over 100 drug-related arrests. Detective Cortez also explained why he found Castro's actions, behaviors, and responses to his questions indicative of criminal activity. He found it unusual that the friend in the passenger seat avoided making eye contact with him. In his experience, Castro's repeated and careful avoidance of dislodging the black sweater on the center console was noticeable and abnormal, as people usually shuffle heedlessly through their things trying to find their paperwork. Despite Castro's explanation, he interpreted her sweating—which soon changed to her being cold and having dry lips—as indicators of nervousness. He found it abnormal that her level of nervousness did not decrease when he told her she was not getting a ticket but only a warning, and believed her repeated laughter and smiles were disingenuous attempts to hide her nervousness. He was also surprised by her lack of offense when he mentioned that he associated her name with drug dealing, and her repeated yawning was something he had seen before from suspects committing a crime.

**¶13**      While all of these factors alone may be innocuous, we will not "focus[] on potential innocent explanations for each individual factor," but rather look to the totality of the circumstances. *State v. O'Meara*, 198 Ariz.

294, 296, ¶ 12 (2000). It was within the superior court's discretion to defer to Detective Cortez's ability to distinguish between innocent and suspicious actions, and we detect no abuse in its ruling that all of these indicia amounted to "more than a hunch that criminal activity was taking place."

## CONCLUSION

¶14     For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:  AA