NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

ALEJANDRO PEREZ, *Appellant.*

No. 1 CA-CR 24-0120

FILED 10-31-2024

Appeal from the Superior Court in Yavapai County
No.  P1300CR202201365
The Honorable Debra R. Phelan, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Gracynthia Claw
*Counsel for Appellee*

Law Offices of Michael J. Dew, Phoenix
By Michael J. Dew, Phoenix
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge James B. Morse Jr. delivered the decision of the Court, in which Presiding Judge Brian Y. Furuya and Judge David D. Weinzweig joined.

---

**M O R S E,** Judge:

¶1          Alejandro Perez appeals his conviction and sentence after trial by jury on four counts: (1) Sale or Transportation of Dangerous Drugs, a class 2 felony; (2) Possession or Use of Dangerous Drugs, a class 4 felony; (3) Possession of Drug Paraphernalia, a class 6 felony; and (4) Promoting Prison Contraband, a class 2 felony.

¶2          Perez asserts the superior court improperly denied his motion to suppress drug evidence seized from his car after a traffic stop.  For the following reasons, we affirm Perez's conviction and sentence.

**FACTS AND PROCEDURAL BACKGROUD**

¶3          An Arizona Department of Public Safety Trooper conducted a traffic stop of Perez's car and discovered drug paraphernalia, a small amount of methamphetamine in the car's interior, and two pounds of methamphetamine in the trunk.  Perez's wife, Misty, drove and Perez was the passenger.

¶4          Perez made a pretrial motion to suppress the evidence.  He argued that the Trooper lacked reasonable suspicion to conduct a drug investigation after the traffic stop and the Trooper unreasonably prolonged the traffic stop to perform a dog sniff.  The court held a suppression hearing at which the Trooper and Perez both testified.  The State also presented body-camera recordings of the encounter.

¶5          The Trooper testified that he was patrolling Interstate 17 with his drug-sniffing canine when a "dirty," black BMW with Texas temporary tags caught his attention.  The Trooper followed the BMW for a few minutes, witnessing it tailgate other cars and misuse the left-passing lane.  As a result, the Trooper initiated a traffic stop.

¶6          The Trooper approached the passenger-side door and began speaking with Perez.  He noted Perez was "breathing pretty fast" and had,

what appeared to be, "track marks on his arms."  The Trooper associated these marks with heroin use.

¶7        The Trooper took the car registration and Misty's driver's license and directed her out of the car while Perez remained seated.  When the Trooper explained why he stopped Misty, he noticed her "blackened" teeth.  The Trooper associated the discolored teeth with illegal drug use.

¶8        The Trooper asked Misty to sit in the patrol car with him while he issued a warning for the moving violation.  While speaking with Misty, the Trooper noticed her rapid speech and her nervous demeanor throughout the conversation.  Misty told the Trooper she was from Texas, but that she and Perez had been visiting Phoenix "over the weekend" and staying in a hotel.  While inputting information into a computer, the Trooper asked about Perez.  Misty described him as her husband.  The Trooper asked Misty if she would mind if he talked with Perez "[w]hile [the warning] is printing."  Misty responded "no, go right ahead."

¶9        The Trooper returned to the car, handed Perez the car registration, and engaged him in conversation.  Perez's description of their trip differed from Misty's.  Perez described a trip to see Misty's children in California and said they spent "a day" in Phoenix.  The Trooper testified that the conflicting stories further roused his suspicion.  The Trooper testified that, at this point, he "believed he had sufficient reasonable suspicion to begin a drug investigation."

¶10       The Trooper walked back to his patrol car where the warning was in the printer.  The Trooper asked Misty if she and Perez had been "out here the whole time together," to which she responded affirmatively.  The Trooper then removed the warning from the printer and handed it to Misty while he asked her whether drugs were in the car.

¶11       The Trooper testified that Misty denied having any drugs in the car but "hesitated" at the mention of methamphetamine.  The Trooper then asked Misty to explain the conflicting stories, but she did not provide an explanation.

¶12       Less than a minute later, the Trooper asked Misty for consent to search the car, which she declined.  The Trooper articulated his suspicions to her then called for backup over his dispatch radio and asked Misty if she had "any problem" with him running a drug-detection dog around the car.  She responded "no, I guess not." The Trooper waited for a backup unit, which arrived about two minutes later.

¶13        With backup, the Trooper walked to the car, obtained Perez's identification, asked him to exit the car, and frisked him. The Trooper got his drug-sniffing dog from his patrol car. The dog alerted to the driver's door and trunk, indicating detection of an illegal drug. The Trooper searched the car, finding drug paraphernalia in the driver's door pocket, a small amount of methamphetamine on the passenger's floor, and two pounds of methamphetamine in the trunk.

¶14        The superior court denied Perez's suppression motion, finding that by the time the Trooper got back into his patrol car with Misty, the Trooper had developed reasonable, articulable suspicion of criminal activity.

¶15        Perez was convicted by a jury on all four counts. The superior court found Perez was a repetitive offender and sentenced him to concurrent terms of imprisonment: (1) 20 Flat years for Sale or Transportation of Dangerous Drugs; (2) 10 years for Possession or Use of Dangerous Drugs; (3) 3.75 years for Possession of Drug Paraphernalia; and (4) 15.75 years for Promoting Prison Contraband. We have jurisdiction under A.R.S. §§ 12-120.21(A)(1), 13-4031, and –4033.

## DISCUSSION

¶16        On appeal, Perez does not dispute the validity of the traffic stop. He only contests the subsequent drug investigation and search of the vehicle. He argues that the Trooper lacked reasonable suspicion to conduct a drug investigation after the traffic stop concluded, and that the Trooper unreasonably prolonged the traffic stop to perform the dog sniff.

¶17        "In reviewing a trial court's decision on a motion to suppress evidence based on an alleged Fourth Amendment violation, we defer to the trial court's factual findings . . . but we review de novo mixed questions of law and fact and the trial court's ultimate legal conclusions as to whether the totality of the circumstances warranted an investigative detention and whether its duration was reasonable." *State v. Teagle*, 217 Ariz. 17, 22, ¶ 19 (App. 2007).

¶18        "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). If the officer unjustifiably prolongs the detention on "unrelated inquiries," the seizure violates the Fourth Amendment even if that additional intrusion is *de minimis*. *Id.* at 354–56.   But "[a]n officer's inquiries into matters unrelated to the

justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

**¶19** Here, the traffic stop concluded when the Trooper handed Misty the warning citation. But the investigation began *before* the traffic stop's conclusion—when the Trooper questioned Misty and Perez about their trip before handing Misty the warning.

**¶20** Once the objective of the traffic stop is accomplished, "the driver must be permitted to proceed on his way without further delay or questioning" unless (1) the encounter becomes consensual, or (2) the officer has, by that time, developed reasonable suspicion of other criminal activity. *Teagle*, 217 Ariz. at 23, ¶ 22. An investigative stop of a person or vehicle may be lawfully conducted without violating the Fourth Amendment if supported by "reasonable suspicion" of illegal activity. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Reasonable suspicion must be based on "specific, articulable facts, along with rational inferences" therefrom, but requires less than probable cause and considerably less than a preponderance of the evidence. *State v. Ramsey*, 223 Ariz. 480, 484, ¶¶ 17–18 (App. 2010). In determining whether an officer possessed reasonable suspicion, we consider "such objective factors as the suspect's conduct and appearance, location, and surrounding circumstances, such as the time of day, and taking into account the officer's relevant experience, training, and knowledge." *State v. Fornof*, 218 Ariz. 74, 76, ¶ 6 (App. 2008).

**¶21** The superior court reviewed body-camera footage of the encounter and heard conflicting testimony from the Trooper and Perez. The Trooper testified that he had been a law-enforcement officer for 18 years and received training regarding "how drugs are transported" and "recognition of deception." The Trooper further testified that he had developed reasonable suspicion based on the totality of his observations. Specifically, the Trooper pointed to his observations regarding: (1) Perez's and Misty's contradicting stories; (2) Perez's rapid breathing and apparent "track marks" on his arms; (3) Misty's "blackened" teeth, rapid breathing, and nervous demeanor; and (4) the dirtiness of the car, indicating a long journey. In response, Perez testified that Misty's speech pattern was her normal tone, that he had no "track marks" on his arms, and that his contradicting story was due to misunderstanding the Trooper's question.

**¶22** The court properly considered the totality of circumstances, including Perez's and Misty's conflicting stories, to find that the Trooper

5

had reasonable suspicion to extend the investigation. *See District of Columbia v. Wesby*, 583 U.S. 48, 58–61 (2018) (finding probable cause to arrest occupants of a home where the totality of circumstances, including "implausible responses" to officers' questions, "suggested criminal activity"); *United States v. Muriel*, 418 F.3d 720, 726 (7th Cir. 2005) ("By the time Sgt. McDonald had completed his work on the traffic stop, he had, by virtue of the inconsistent stories received from the occupants, reasonable suspicion to inquire further."); *United States v. Ameling*, 328 F.3d 443, 449 (8th Cir. 2003) (stating that "apparently false statements and inconsistent stories were sufficient to give the officers probable cause that the defendants were involved in criminal conduct"); *State v. Valenzuela*, 121 Ariz. 274, 276 (1979) (noting that false answers to police questions may establish probable cause); *see also Kansas v. Glover*, 589 U.S. 376, 380 (2020) (permitting officers to make "commonsense judgments and inferences about human behavior") (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)).

**¶23**         "In reviewing the totality of the circumstances, we accord deference to a trained law-enforcement officer's ability to distinguish between innocent and suspicious actions." *Teagle*, 217 Ariz. at 24, ¶ 26. Considering all the circumstances, the court credited the Trooper's testimony. Nothing in the record overcomes our deference to the superior court's finding. *See id.* at 22, ¶ 19.

**¶24**         Lastly, Perez relies on *State v. Sweeney*, 224 Ariz. 107 (App. 2010), to argue the Trooper lacked reasonable suspicion.[1] In *Sweeney*, an officer issued the defendant a warning, wished him a safe trip, and, as the defendant walked back toward their car, the officer called him back and requested consent to search his car. *Id.* at 109–10, ¶¶ 3–5. The defendant declined and attempted to leave, at which point the officer grabbed and detained him, subsequently searching the car and finding cocaine. *Id.* at ¶¶ 5–6. There, this Court found the officer did not have reasonable suspicion to proceed with the subsequent search because the officer impermissibly relied on defendant's refusal to consent to a search as reasonable suspicion

---

[1]         Perez also cites *Sweeney* to argue we should review the video evidence presented at the superior court de novo. We will defer to the superior court's factual findings if they are "reasonably supported by the evidence." *State v. Adair*, 241 Ariz. 58, 60, ¶ 9 (2016); *see also State v. Sandoval Beltran*, 1 CA-CR 23-0142, 2024 WL 1930995, at *2, ¶ 10 n.2 (Ariz. App. May 2, 2024) (mem. decision). Our independent review of the video evidence supports the superior court's findings. *Adair*, 241 Ariz. at 60, ¶ 9.

and was unable to articulate reasonable suspicion otherwise. *Id.* at 113, 114–15, ¶¶ 24, 31–32.

**¶25** Perez's reliance on *Sweeney* is misplaced. As discussed *supra* ¶¶ 19–23, we find that the totality of the circumstances established the Trooper's reasonable, articulable suspicion of criminal activity before he returned to his patrol car and concluded the traffic stop. And, unlike the defendant in *Sweeney*, Perez does not argue that Misty's later refusal to consent to a search was a factor in the Trooper's reasonable suspicion. The superior court did not err when it concluded that the Trooper did not extend the stop until he had reasonable suspicion.

## CONCLUSION

**¶26** For the foregoing reasons, we affirm Perez's conviction and sentence.

