NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

RYAN WILLIAM KOCHENDARFER, *Appellant.*

No. 1 CA-CR 20-0364
FILED 8-19-2021

Appeal from the Superior Court in Mohave County
No. S8015CR201900395
The Honorable Derek C. Carlisle, Judge

**REVERSED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michelle L. Hogan
*Counsel for Appellee*

Griffen & Stevens Law Firm, PLLC, Flagstaff
By Bruce S. Griffen
*Counsel for Appellant*

Jackson Square Law, Sausalito, California
By Zenia K. Gilg, *Pro Hac Vice*
*Counsel for Appellant*

## MEMORANDUM DECISION

Presiding Judge D. Steven Williams delivered the decision of the Court. Judge Jennifer B. Campbell specially concurred. Judge James B. Morse Jr. dissented.

**W I L L I A M S**, Judge:

¶1        Ryan Kochendarfer appeals the superior court's order denying his motion to suppress evidence obtained during a traffic stop. Because the state unlawfully prolonged the traffic stop without reasonable suspicion of criminal activity, we reverse the court's denial of the suppression motion, vacate Kochendarfer's convictions and resulting sentences, and remand for further proceedings consistent with this decision.

## FACTUAL AND PROCEDURAL HISTORY

¶2        One rainy day in February 2019, Trooper Dickinson of the Arizona Department of Public Safety ("DPS") stopped a pickup truck for following a tractor-trailer too closely on the I-40. After making contact with Kochendarfer (the driver and sole occupant), the Trooper asked for Kochendarfer's driver's license, registration, and proof of insurance, then directed Kochendarfer to exit the pickup and sit in the front passenger seat of the Trooper's patrol vehicle.

¶3        As Kochendarfer sat in the patrol vehicle, the Trooper's K-9, caged directly behind the passenger seat, began barking loudly and aggressively. Understandably, Kochendarfer was startled. Once seated, Kochendarfer began searching for his insurance card on his phone, but because of limited internet connection, was unable to retrieve it. The Trooper asked Kochendarfer questions while the two were seated in the patrol vehicle and while the Trooper was filling out a traffic warning. The Trooper asked Kochendarfer about the pickup truck's Texas license plate and Kochendarfer's California driver's license. Kochendarfer relayed he was in the process of moving from California to Texas and had made multiple trips in the past several months. The Trooper also asked about Kochendarfer's trips, current residence, employment, and travel history. Kochendarfer explained that he was moving to Texas to work for his in-laws and provided information about their business. He explained he was a heavy equipment operator and an electrician.

¶4           At the suppression hearing, the Trooper testified that before he initiated the traffic stop, he retrieved data from a license plate reader. The data indicated Kochendarfer's pickup made three previous trips going westbound on the I-10 toward California and eastbound on the I-40 toward Texas over the past few months. Without knowing the Trooper had this information, Kochendarfer truthfully relayed that he recently made a few trips between Texas and California. This information was consistent with the information the Trooper obtained prior to the stop. The Trooper later testified that, once in the patrol vehicle, Kochendarfer was visibly nervous, fidgeted with his phone, bit his lip, and played with his mustache. Eleven minutes after initiating the traffic stop, the Trooper handed Kochendarfer the completed traffic warning.

¶5           Immediately after being handed the traffic warning, Kochendarfer asked the Trooper about his experience as a heavy equipment operator, a subject that had come up during the Trooper's questions regarding Kochendarfer's employment. The exchange lasted about twenty seconds. The Trooper then asked Kochendarfer several questions about criminal activity and drug transportation. Kochendarfer denied any involvement. The Trooper then asked to check Kochendarfer's pulse. Kochendarfer complied.

¶6           After checking Kochendarfer's pulse, which the Trooper determined was 120 beats per minute, the Trooper asked to search the pickup. Kochendarfer refused. The Trooper then asked if he could run his K-9 around the pickup. Kochendarfer replied, "If I'm being detained, if not I'd like to go on my way." The Trooper instructed Kochendarfer to "hang tight here" while he ran the K-9 around the pickup. At that point, the traffic stop had reached nearly thirteen minutes in duration. At some point during the traffic stop, another officer arrived and stood near the back of the patrol vehicle on the passenger side near Kochendarfer.

¶7           Kochendarfer remained seated in the patrol vehicle while the K-9 performed an exterior sniff of the pickup. After the dog alerted to the presence of drugs, the Trooper searched the pickup and found more than 300 pounds of marijuana in the bed of the pickup.

¶8           Kochendarfer was charged with possession of marijuana for sale and transportation of marijuana for sale. A.R.S. § 13-3405(A)(2), (4). Before trial, Kochendarfer moved to suppress the physical evidence challenging the basis for the traffic stop, contending the Trooper unlawfully prolonged the stop beyond the time reasonably required for its completion, and arguing the Trooper lacked reasonable suspicion of criminal activity before the K-9 alerted. Following an evidentiary hearing, the superior court

denied Kochendarfer's motion. At trial, a jury found Kochendarfer guilty as charged. This timely appeal followed. We have jurisdiction under Article 6, Section 9, of the Arizona Constitution, and A.R.S. §§ 12-120.21(A)(1), 13-4031, and -4033(A)(1).

## DISCUSSION

**¶9**        We review the denial of a suppression motion giving deference to the superior court's factual findings, including its findings on credibility, but review de novo mixed questions of law and fact, as well as the court's legal conclusion as to whether an investigative detention was warranted and of reasonable duration. *State v. Teagle*, 217 Ariz. 17, 22, ¶ 19 (App. 2007).

**¶10**        A traffic stop must "last no longer than necessary to effectuate the purpose of the stop," *Florida v. Royer*, 460 U.S. 491, 500 (1983), which includes "checking the driver's license, determining whether there are outstanding warrants against the driver," "inspecting the automobile's registration and proof of insurance," and the time required for officers "to attend to related safety concerns," *Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015). An officer's authority for the stop "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354. Once the mission of the traffic stop is or reasonably should be completed, the officer must allow the vehicle's occupants to continue on their way unless the encounter becomes consensual, or the officer has developed a reasonable and articulable suspicion of criminal activity. *State v. Kjolsrud*, 239 Ariz. 319, 322–23, ¶ 10 (App. 2016).

**¶11**        The overall encounter between Kochendarfer and the Trooper consisted of three distinct phases: (1) the first investigatory detention, which included the traffic stop and the Trooper's actions directly tied to the mission of the traffic stop; (2) the encounter following the completion of the traffic stop; and (3) the second investigatory detention where the K-9 performed an exterior sniff of the pickup, followed by the Trooper's search of the pickup.

### 1.        The First Investigatory Detention (the Traffic Stop)

**¶12**        Kochendarfer first contends the Trooper lacked "justification" to initiate the traffic stop. The Trooper noted in his written report that he stopped Kochendarfer because he had been following a FedEx truck too closely. At the suppression hearing, the Trooper testified it was a tractor-trailer that Kochendarfer followed too closely but did not specify it was a FedEx truck. As to that apparent discrepancy, the Trooper alluded

that he was mistaken when he referenced a FedEx truck in his written report. A review of the video recording shows a tractor-trailer from a different company pass by shortly after Kochendarfer pulled his pickup to the side of the road, but also shows a FedEx truck pass by several minutes later. The superior court determined the Trooper was "apparently mistaken" about which truck Kochendarfer was following too closely, but that the Trooper was "credible with respect to the basis for the stop." *See Kjolsrud*, 239 Ariz. at 322, ¶ 9 (noting that a traffic stop is permissive so long as the officer possesses reasonable suspicion that the driver has committed an offense); *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation."). On this record, reasonable evidence supports the court's credibility and factual findings. Kochendarfer has shown no error.

**¶13** Kochendarfer also contends the Trooper should not have asked him to sit in the patrol vehicle during the traffic stop. The Trooper testified that, because of "officer safety," at least in part, he frequently asks those he has stopped for a suspected traffic violation to sit in his patrol vehicle. Case law allows for the same, at least to some degree. *See Kjolsrud*, 239 Ariz. at 323, ¶¶ 13-14; *cf., United States v. Flores*, 474 F.3d 1100, 1102, 1104 (8th Cir. 2007) (holding that a roadside encounter, which involved sitting in the passenger seat of a patrol car, was not unduly coercive). But the Trooper also noted he directs traffic detainees to sit in his patrol vehicle for "other things" not directly linked to officer safety, like "DUI investigations."

**¶14** Once in the patrol vehicle, the Trooper's questions of Kochendarfer while completing the traffic warning, even on matters unrelated to the traffic stop, were likewise permissible because they did not extend the duration of the stop. *See Johnson*, 555 U.S. at 333 (noting law enforcement questions unrelated to the traffic stop are permissible "so long as those inquiries do not measurably extend the duration of the stop"). Once the Trooper completed the warning and handed it to Kochendarfer, the purpose for the traffic stop had been accomplished and the Trooper's authority to prolong the stop had come to an end, absent a legal exception. *See Rodriguez*, 575 U.S. at 354 (an officer's authority for the stop "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed").

> 2. *The Encounter Immediately Following the Completion of the First Investigatory Detention*

**¶15** Immediately after being handed the traffic warning and his documents, Kochendarfer asked about the Trooper's experience operating heavy equipment. The exchange lasted twenty seconds and was likely

consensual. That brief conversation was followed by another thirty-five seconds of the Trooper asking Kochendarfer about criminal activity. Kochendarfer answered each question. *See State v. Rodriguez*, 1 CA-CR 18-0127, 2019 WL 1785298, at *3, ¶ 14 (Ariz. App. Apr. 23, 2019) (mem. decision) ("But an officer's brief questioning after issuing a traffic violation warning can be a permissible consensual encounter if the driver agrees to answer questions."). Kochendarfer also agreed to the Trooper checking his pulse. But once Kochendarfer refused to allow the Trooper to search his pickup or run a K-9 around the pickup's exterior, the encounter was clearly no longer consensual and the Trooper was required to allow Kochendarfer to be on his way absent a reasonable and articulable suspicion of criminal activity. *See Kjolsrud*, 239 Ariz. at 322-23, ¶ 10.

¶16 The superior court found as a factual matter that the encounter between Kochendarfer and the Trooper had become "consensual" after Kochendarfer was given the warning. And, to a point, the record supports the court's finding. What is concerning about the court's finding, however, is that during the entire encounter, Kochendarfer was sitting inside a closed patrol vehicle, with a Trooper and a K-9 for over ten minutes. A second Trooper and patrol vehicle arrived before the warning was issued. Given the confluence of factors, it is unclear that Kochendarfer felt he was free to leave, or that any reasonable person would have felt free to leave, once he received the paperwork. But when the following exchange took place, after the Trooper took Kochendarfer's pulse, the encounter was certainly no longer consensual:

> [Trooper]: That's a little high there. May I search your vehicle?
>
> [Kochendarfer]: I'd actually really like to go on my way, if you don't mind.
>
> [Trooper]: Ok, as you know I have a police dog right here, may I run her around the exterior real quick? She is trained to alert to odors of marijuana, methamphetamine, cocaine, and heroin.
>
> [Kochendarfer]: If I'm being detained. If not, I'd like to go on my way.
>
> [Trooper]: Ok. Yeah. Just go ahead and hang tight here, okay. I am going to run my dog around your car.

¶17 The question then becomes whether the Trooper had a reasonable and articulable suspicion of criminal activity, justifying his

continued detention of Kochendarfer, for the K-9 to conduct an exterior sniff of the pickup despite Kochendarfer's refusal.

### 3.    *The Second Investigatory Detention*

**¶18**        Kochendarfer's final contention is that the Trooper lacked reasonable suspicion of criminal activity justifying the second investigatory detention and the warrantless search of the pickup. *See State v. Canales*, 222 Ariz. 493, 495, ¶ 9 (App. 2009) (reasonable suspicion justifying detention is "a justifiable suspicion that the particular individual to be detained is involved in criminal activity" (quoting *State v. Graciano*, 134 Ariz. 35, 37 (1982))). Reasonable suspicion requires an officer have "a particularized and objective basis" considering the totality of circumstances for suspecting criminal activity, *Kjolsrud*, 239 Ariz. at 323, ¶ 15 (quoting *State v. Evans*, 237 Ariz. 231, 234, ¶ 8 (2015)), which must be "more than an inchoate 'hunch,'" *Teagle*, 217 Ariz. at 23, ¶ 25. Reasonable suspicion turns on various "objective factors," like behavior, appearance, location, and time. *State v. Fornof*, 218 Ariz. 74, 76, ¶ 6 (App. 2008).

**¶19**        The superior court concluded, as a matter of law, that the Trooper had reasonable suspicion of criminal activity. We disagree. The court noted its reliance upon the following testimony from the Trooper in reaching its legal conclusion: (1) Kochendarfer traveled three times over roughly a two month period between Texas and California, taking different routes while traveling east compared to traveling west, (2) in conducting more than 10,000 traffic stops the Trooper had never experienced any unexplained difference in routes among the innocent motoring public, (3) a scarcity of items in the cab of the pickup for someone in the process of moving, (4) nervousness indicated by Kochendarfer playing with his lip, mustache, and phone, (5) a pulse of 120 beats per minute, (6) Kochendarfer's avoidance of certain topics while conversing with the Trooper and statements seeming "rehearsed" regarding his employment, (7) and that Texas is a destination hub for illegal drugs.

**¶20**        In assessing the Trooper's credibility, the court found that the Trooper "was impeached regarding some of his testimony, including [Kochendarfer's] employment and the flipping of the license plate," once confronted with video evidence. In other words, the court found the Trooper was either less than truthful on some subjects or simply mistaken. This finding is supported by record evidence. The court also found that some of the Trooper's "testimony was less compelling," but then "mostly found [the Trooper] credible."

**¶21**         As noted, *supra* ¶18, reasonable suspicion must be more than an inchoate hunch. Rather, the articulated circumstances together "must serve to eliminate a substantial portion of innocent travelers." *Teagle*, 217 Ariz. at 24, ¶ 25 (quoting *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004)). And while we defer to the superior court's factual findings, so long as they are "reasonably supported by the evidence," *State v. Adair*, 241 Ariz. 58, 60, ¶ 9 (App. 2016), we cannot say, considered in the aggregate, that the factors identified by the court rise to objective reasonable suspicion. We review each factor the court considered.

**¶22**         Regarding the first two factors the superior court relied upon, both surrounding differing routes traveling to or from Texas, a reasonably prudent person's suspicions would not be raised by travel patterns where both routes required approximately the same amount of travel time. The Trooper testified that both routes Kochendarfer drove took about 32 hours to complete and were within 11 total miles of each other. And, despite the Trooper's speculation that the varying routes were driven in an attempt to avoid checkpoint locations, the record reveals that the Trooper was not entirely sure where checkpoints along either interstate were located outside of Arizona. Further, spending more time in one state over another does not "eliminate a substantial portion of innocent travelers," particularly those in the process of moving. *Teagle*, 217 Ariz. at 24, ¶ 25.

**¶23**         The court also found that the scarcity of items in the cab of the pickup for someone in the process of moving supported a legal finding of reasonable suspicion of criminal activity. The Trooper testified that there was "only a backpack, a cowboy hat, and an empty [clothes] hamper on the backseat." The bed of the pickup, however, had a cover on it preventing the Trooper from knowing whether the bed was full of Kochendarfer's personal belongings or whether it was empty. We cannot say this factor gives rise to reasonable suspicion.

**¶24**         The court pointed out Kochendafer's nervousness, pulse of 120 beats per minute, and avoidance of certain topics. Upon review of the recorded video conversation between the two, we see little evidence to support the Trooper's assertion that Kochendarfer avoided certain topics during the exchange. To the contrary, he seemed to respond appropriately to each question and was conversational. Likewise, it is difficult in reviewing the video recording to conclude that Kochendarfer behaved in any more of a nervous manner than the general innocent motoring public would have, or that his statements regarding employment seemed rehearsed. And it's difficult to give any weight to Kochendarfer's high pulse rate as an indicator of criminal activity given the requirement that he sit in the patrol vehicle from the outset, the surprise of an aggressively barking

K-9, the proximity of the K-9 throughout the stop, and the addition of a second Trooper standing close by outside of the patrol vehicle.

¶25 And while we accord a level of deference to a law enforcement officer's training and experience, *see Kjolsrud*, 239 Ariz. at 323, ¶ 15, we question what deference ought to be given to the Trooper's claim that he never encountered innocent individuals taking differing routes to or from a destination, or that "Texas is a huge hub . . . for receiving drugs."

¶26 For all these reasons, we conclude the Trooper lacked reasonable suspicion of criminal activity, and unlawfully prolonged the traffic stop beyond the time needed for its completion. Consequently, any evidence obtained from a search of the pickup must be suppressed. Accordingly, we reverse the superior court's denial of Kochendarfer's motion to suppress, vacate Kochendarfer's convictions and resulting sentences, and remand for further proceedings consistent with this decision.

## CONCLUSION

¶27 Because the Trooper lacked reasonable suspicion of criminal activity and unlawfully prolonged the traffic stop beyond the time needed for its completion, the superior court's order denying the motion to suppress is reversed, Kochendarfer's convictions and resulting sentences are vacated, and the matter is remanded to the superior court for further proceedings.

C A M P B E L L, Judge, specially concurring:

¶28 I agree with the result reached in the majority decision—the superior court erred by denying the motion to suppress because the trooper lacked reasonable suspicion to detain Kochendarfer after issuing a written warning. I write separately because what began as a lawful seizure became unlawful once the purpose of the traffic stop was complete. A driver may consent to a continued detention only if he has a choice, as assessed by a reasonable person standard. Here, the trooper never stated, or even implied, that Kochendarfer was free to leave after he dispensed the written warning. Without such an instruction, given the particular circumstances of this case, Kochendarfer could not legally consent to a continuing police encounter.

**¶29**         As noted, *supra* ¶ 10, a police officer conducting a traffic stop may check a driver's license, inspect an automobile's registration and proof of insurance, and attend to any related safety concerns. *Rodriguez*, 575 U.S. at 356 (noting an officer may take "negligibly burdensome precautions" that are necessary to complete the stop safely). But even traffic stops initially supported by reasonable suspicion may violate the Fourth Amendment if the officer diverts from the stop's purpose and exceeds its permissible scope. *See State v. Boteo-Flores*, 230 Ariz. 105, 107, ¶ 11 (2012).

**¶30**         After asking for Kochendarfer's license and registration, the trooper ordered him to exit his truck, escorted him to the passenger side of the patrol car, and directed him to sit inside the passenger compartment. When Kochendarfer got in, he was immediately greeted by the loud barking of the trooper's caged K-9 directly behind his seat. Kochendarfer was understandably quite startled by the dog, as evinced by both his visible and audible reactions, and said so once the trooper reentered the patrol car. While Kochendarfer was sitting in the patrol car with the trooper, another officer arrived and took up a position immediately outside the vehicle, near the passenger door of the patrol car.

**¶31**         Law enforcement officers may "remove occupants from [their] vehicle as a safety precaution." *Kjolsrud*, 239 Ariz. at 323, ¶ 13 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 117 n.6 (1977)). But even assuming a police officer may lawfully require a motorist to wait inside a patrol car during a traffic stop, without any particularized safety concern, the detention must end "once the purposes of the initial traffic stop [are] completed." *United States v. Bradshaw*, 102 F.3d 204, 212 (6th Cir. 1996) (characterizing an officer's detention of a motorist in his police car as "a legitimate exercise of valid routine police procedure"); *see also United States v. Baker*, 78 F.3d 1241, 1244 (7th Cir. 1996) (explaining a police officer conducting a valid traffic stop may "legitimately ask" a driver to sit in his patrol car, "even without any particularized suspicion"); *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (holding the "reasonable investigation" of a traffic stop "includes asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose"). In other words, the detention of a motorist inside a patrol vehicle violates the Fourth Amendment if it extends beyond the time necessary to complete the purpose of the initial stop, absent consent or reasonable suspicion justifying a further detention. *See Bradshaw*, 102 F.3d at 212.

**¶32**         To determine whether a continued detention was consensual, we look to the totality of the circumstances and ask whether a reasonable person under those circumstances would have felt free to leave. *State v.*

*Childress*, 222 Ariz. 334, 338, ¶ 11 (App. 2009) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Based on the dash camera video, a reasonable person in Kochendarfer's position would not have felt free to leave the patrol car at any point after the trooper returned the license and registration and issued the written warning. The trooper had placed Kochendarfer in an unfamiliar and intimidating situation, creating the very nervousness the trooper then sought to rely on as a reasonable basis to continue his detention. But any reasonable person would exhibit signs of nervousness, such as an elevated pulse, when placed in a patrol car, next to an aggressively barking dog, with a patrol officer guarding the passenger door. *United States v. Massenburg*, 654 F.3d 480, 490 (4th Cir. 2011) ("[I]t is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity.") (quotation and citation omitted). Because the trooper never told Kochendarfer that he could leave the patrol car and another officer remained stationed near the passenger door after the trooper issued him the warning, Kochendarfer was not free to leave once the purpose of the traffic stop was completed. *See United States v. Bowman*, 884 F.3d 200, 210–13 (4th Cir. 2018) (concluding a continuing police encounter involving a stopped motorist detained inside a patrol car was not consensual after the officer issued a warning, returned the motorist's license and registration, shook his hand, but told him to "hang tight"). Simply put, the encounter never became consensual.

¶33        It is concerning that the trooper's routine practice of requiring motorists to sit in his K-9 patrol vehicle while he checks the motorists' documents only came to light because, here, the trooper discovered contraband. We will never know how many motorists the trooper has forced to sit in his patrol car with his barking K-9, creating the resulting nervous reaction that he then used to justify his reasonable suspicion.

¶34        In summary, I agree with the majority opinion that the superior court should have granted Kochendarfer's motion to suppress but conclude that no part of the extended investigative detention, after the trooper issued the warning to Kochendarfer, was consensual. The trooper never suggested, much less explicitly stated, that Kochendarfer was free to leave. To be clear, I question the trooper's practice of routinely requiring motorists to wait in his K-9 patrol car, even absent any particularized safety concerns, and conclude that any nervousness a motorist exhibits under such circumstances cannot reasonably serve as a basis to suspect him of criminal activity.

**M O R S E,** Judge, dissenting:

¶35        I respectfully dissent because I agree with the superior court that the Trooper had reasonable suspicion of criminal activity.

¶36        The Trooper testified that he had learned, via a search of a license-plate reader database, that this was the third time in four months that Kochendarfer traveled westbound on the I-10 from Texas to California before switching to the I-40 for his eastbound return trip. The Trooper explained that this travel pattern was common among drug traffickers seeking to avoid the higher levels of enforcement activity on the I-10 when transporting drugs eastbound from California. The Trooper had extensive drug-interdiction training, received monthly reports on the latest drug-trafficking trends, had conducted thousands of traffic stops, and testified that the westbound I-10 / eastbound I-40 route was a "well known" trend of drug traffickers. He further stated that he had successfully interdicted numerous drug loads involving drivers who had taken multiple trips following that travel pattern. In fact, the Trooper testified that every time he had stopped a vehicle with "more than one trip doing that same thing," it had resulted in a drug seizure.

¶37        The superior court found the Trooper credible and determined that he had reasonable suspicion for the brief additional detention necessary to conduct the exterior canine sniff. During oral argument before this Court, counsel for Kochendarfer conceded that the use of two different travel routes "would increase reasonable suspicion" if the Trooper's testimony "made sense," but argued the Trooper's testimony was not credible. The Majority "question[s] what deference ought to be given" to some of the Trooper's claims, apparently because it does not find those claims to be particularly credible. *See supra* ¶ 25. But because we must defer to the superior court's credibility determinations, *see Teagle*, 217 Ariz. at 22, ¶ 19, I would conclude that the Trooper had reasonable suspicion to briefly prolong the initial detention.

¶38        The Majority asserts the Trooper lacked reasonable suspicion because the circumstances prompting the search failed to "eliminate a substantial portion of innocent travelers." *Supra* ¶¶ 21-22. But our supreme court rejected that approach and held "that reasonable suspicion under the Fourth Amendment does not require officers to testify about how their observations reduce or eliminate the possibility that innocent travelers will be subject to seizures or trial courts to make specific findings on that issue." *Evans*, 237 Ariz. at 235, ¶¶ 14, 16-17; *see also State v. Ramsey*, 223 Ariz. 480, 485, ¶ 23 (App. 2010) ("When determining whether reasonable suspicion

exists, the police are not required to rule out the possibility of innocent explanations for a defendant's conduct."); *United States v. Arvizu*, 534 U.S. 266, 277 (2002) (holding that reasonable suspicion "need not rule out the possibility of innocent conduct"); *United States v. Sokolow*, 490 U.S. 1, 10 (1989) (stating the "relevant inquiry" in determining reasonable suspicion "'is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts'" (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983))).

¶**39**       The Majority further suggests that "a reasonably prudent person's suspicions would not be raised by travel patterns where both routes required approximately the same amount of travel time." *Supra* ¶ 22. But that argument ignores the context provided by the Trooper's experience and training. *See, e.g., Terry v. Ohio*, 392 U.S. 1, 23 (1968) (noting that store windows "are made to be looked in," but it would be "poor police work" if the officer hadn't investigated after observing two men taking multiple turns walking back and forth to stare inside a store window, then conferring, and being joined by a third man). The Trooper adequately explained why multiple trips via a possibly innocent, but odd, travel route were consistent with drug traffickers attempting to avoid checkpoints and increased enforcement on the I-10 traveling eastbound.[1] *See Arvizu*, 534 U.S. at 277 (noting defendant's unusual route—commonly used by smugglers to avoid checkpoints—was a factor contributing to reasonable suspicion); *Sokolow*, 490 U.S. at 9 (finding reasonable suspicion, in part, because travel from Honolulu to Miami for 48-hour trip in July was unusual); *Teagle*, 217 Ariz. at 24-25, ¶ 28 (finding the "nature of defendant's travel plans," including the fact the defendant was stopped "in a known drug corridor," contributed to reasonable suspicion); *see also United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013) (en banc) (recognizing agents' testimony that route was "commonly used by smugglers" as a factor contributing to reasonable suspicion); *United States v. Cheromiah,* 455 F.3d 1216, 1219, 1221-22 (10th Cir. 2006) (finding the use of a route typically used by smugglers to avoid checkpoints contributed to reasonable suspicion).

---

[1]       The Majority asserts that the Trooper "was not entirely sure where checkpoints along either interstate were located outside of Arizona." *Supra* ¶ 22. But the Trooper testified that he knew of the possibility of out-of-state checkpoints on the I-10, there are "less officers on Interstate 40 and there [are] more on I-10," and fewer "officers on I-10 work the out-of-state westbound traffic, and it's well known. As well as checkpoints on I-10 are for going eastbound."

¶40          Moreover, the use of multiple travel routes must be evaluated in conjunction with the Trooper's reasons for believing those routes are suspicious. *See Ramsey*, 223 Ariz. at 485, ¶ 23 ("The facts constituting reasonable suspicion cannot be viewed in isolation, or subtracted in a piecemeal fashion from the whole, but must be considered in the context of the totality of all the relevant circumstances."); *Sokolow*, 490 U.S. at 9 (finding that factors consistent with innocent travel, when taken together, amounted to reasonable suspicion); *United States v. Calvetti*, 836 F.3d 654, 667 (6th Cir. 2016) (finding that claimed travel plans were "dubious" where travelers had "almost no luggage, despite claiming that they were relocating from one state to another"); *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997) (recognizing that "contradictory or implausible travel plans can contribute to a reasonable suspicion of illegal activity").

¶41          Finally, the Trooper's suspicion was not dispelled, and possibly bolstered, during his interaction with Kochendarfer. *See Royer*, 460 U.S. at 498-99 (noting the purpose of temporary detention based on reasonable suspicion is to allow a brief investigation to "verify or dispel" the suspicion); *see also State v. Tucker*, 1 CA-CR 17-0487, 2018 WL 1955448, *4, ¶¶ 17-18 (Ariz. App. Apr. 26, 2018) (mem. decision) (finding reasonable suspicion based on inconsistencies in travel plans and defendant's elevated heart rate); *United States v. Marin*, 988 F.3d 1034, 1041-42 (8th Cir. 2021) (finding reasonable suspicion to extend traffic stop in part because defendant's "heart rate was elevated"); *United States v. Dion*, 859 F.3d 114, 127 (1st Cir. 2017) (finding evidence of a "pounding carotid artery" and "pulse in the area of [the defendant's] stomach" showing nervousness contributed to reasonable suspicion to extend a stop). Thus, considering the totality of the circumstances, it was reasonable for the Trooper to continue to suspect Kochendarfer of drug trafficking.

¶42          The Trooper explained why his training and experience led to his suspicion that Kochendarfer's repeated travel pattern might be associated with drug trafficking. Nothing in the record suggests this suspicion "was the product of a volatile or inventive imagination . . . the record evidences the tempered act of a policeman who in the course of an investigation had to make a quick decision . . . and took limited steps to do so." *Terry*, 392 U.S. at 28. Accordingly, I would affirm the superior court.

